## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| DESIREE LUCAS and DOMINIQUE HINTON, individually, and on behalf of all all similarly situated persons,<br><br>             Plaintiffs,<br><br>v.<br><br>URBAN ONE, INC.,<br><br>             Defendant. | CIVIL ACTION NO. :<br><br>_____<br><br>**JURY TRIAL DEMANDED** |

## COLLECTIVE ACTION COMPLAINT

Plaintiffs Desiree Lucas and Dominique Hinton file this Complaint against Defendant Urban One, Inc. ("Urban One"), showing the Court the following:

## INTRODUCTION

1.     This action is brought pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 207 and 216(b), to recover unpaid overtime wages and damages owed to Plaintiffs and those similarly situated who elect to opt-in to this action pursuant to the FLSA §§ 201 *et seq*., and specifically the collective action provision of  § 216(b), to remedy violations of the overtime  provisions of the FLSA by Urban One that have deprived Plaintiffs and others similarly situated of their lawfully earned overtime wages.

2.      Plaintiffs also bring individual claims under the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d).

3.      Plaintiffs also bring individual claims for retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., ("Title VII").

4.      This action challenges Urban One's willful failure to pay Plaintiffs and others similarly situated the overtime rate of one and one-half times their regular rate for all hours worked above forty (40) hours in a given workweek.

5.      This action also challenges Urban One's failure to pay Ms. Lucas and Ms. Hinton commensurate with similarly situated male employees.

6.      In addition, this action challenges Urban One's retaliation against Plaintiffs, after Plaintiffs complained of a sexual harassment in the workplace.

7.      Plaintiffs are entitled to recover overtime wages, back pay, liquidated damages, compensatory damages, punitive damages, plus interest, reasonable attorneys' fees, and costs.

## JURISDICTION AND VENUE

8.      Jurisdiction of this Court is invoked pursuant to the FLSA, 29 U.S.C. § 216(b) and 28 U.S.C. §§ 1331 and 1337.

9.      This Court also has federal question jurisdiction pursuant to Title VII, 42 U.S.C. § 2000e-5(f)(3) and  28 U.S.C. §§ 1331.

10.    The violations of Plaintiffs' rights occurred in the Northern District of Georgia. Venue for this action in the Northern District of Georgia under 28 U.S.C. § 1391(b) is appropriate because a substantial part of the events or omissions, and the unlawful actions and practices which give rise to Plaintiffs' claims occurred in this District.

## ADMINISTRATIVE PROCEEDINGS

11.    Ms. Lucas filed a charge of sex discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") on August 22, 2018.  She filed an amendment to her charge on September 3, 2019.

12.    Ms. Lucas received a notice of a right to sue from the EEOC within the last 90 days and has complied with all other conditions precedent to the institution of this lawsuit.

13.    Ms. Hinton filed a charge of sex discrimination and retaliation with the Equal Employment Opportunity Commission on September 19, 2018.

14.    Ms. Hinton received a notice of a right to sue from the EEOC within the last 90 days and has complied with all other conditions precedent to the institution of this lawsuit.

## PARTIES

15.    Plaintiff Desiree Lucas is a citizen of the United States and a resident

of the state of Georgia.

16.     Ms. Lucas is a current employee of Urban One.

17.     Ms. Lucas was hired as a production assistant in or around August 2012 and continues to work in this capacity.

18.     Since her hire, Ms. Lucas has been an employee of Urban One within the meaning of the FLSA and has regularly worked for Urban One for more than forty (40) hours per workweek, but has not been paid the overtime rate of one and one-half times her regular rate for all hours worked above forty (40) hours in a given workweek.

19.     Ms. Lucas consents to be a party to this action pursuant to 29 U.S.C. § 216(b).  Her executed consent form is attached as Exhibit A.

20.     Plaintiff Dominique Hinton is a citizen of the United States and a resident of the state of Georgia.

21.     Ms. Hinton is a former employee of Urban One who worked first as an unpaid intern from in or around 2005 until in or around 2012, then as a board operator from in or around July 2012 until May 2018.

22.     While she worked at Urban One, Ms. Hinton was an employee of Defendant within the meaning of the FLSA and regularly worked for Urban One for more than forty (40) hours per workweek, but was not paid the overtime rate of

one and one-half times her regular rate for all hours worked above forty (40) hours in a given workweek.

23.     Ms. Hinton consents to be a party to this action pursuant to 29 U.S.C. § 216(b).  Her executed consent form is attached as Exhibit B.

24.     Defendant Urban One, Inc. ("Urban One") is a Delaware corporation doing business in Georgia, with its principal place of business at 1010 Wayne Avenue in Silver Springs, Maryland 20910.

25.     Defendant may be served with process by delivering a copy of a summons and this Complaint to its registered agent, Corporation Service Company at 40 Technology Parkway South, Suite 300, in Norcross, Georgia 30092.

26.     Defendant Urban One, Inc. is formerly known as Radio One, Inc.

27.     Urban One is a media conglomerate and broadcasting company that operates over 50 radio stations throughout the United States, a cable television network, and an online portfolio of digital brands.

28.     Urban One's Atlanta division, consisting of multiple radio stations, is Radio One Atlanta.

29.     Radio One Atlanta's offices are located at 101 Marietta Street NW, 12th Floor, Atlanta, GA 30303, and within the jurisdiction of this Court.

30.     Radio One Atlanta's commercial-based radio stations operate

nationally and can be streamed on the internet from any location via Urban One's website.

31.     Radio One Atlanta engages in interstate commerce.

32.     At all times relevant to this Complaint, Urban One, as a national radio and television operator, has engaged in interstate commerce under the FLSA, 29 U.S.C. § 203(s).

33.     Upon information and belief, Urban One's annual gross volume of sales made or business done is not less than $500,000.

34.     Upon information and belief, under 29 U.S.C. §§ 201 *et seq*., and the cases interpreting the same, Urban One constitutes an enterprise engaged in commerce.

35.     At all relevant times, Urban One was Plaintiffs' employer as defined by the FLSA, 29 U.S.C. § 203(d), the EPA, 29 U.S.C. § 203(d), and Title VII, 42 U.S.C. § 2000e(b).

36.     As the current employer of Ms. Lucas, Urban One has the power to hire and fire Ms. Lucas, supervise and control her work schedules, determine her pay rate, and maintain her employment records.

37.     As the former employer of Ms. Hinton, Urban One had the power to hire and fire Ms. Hinton, supervise and control her work schedules, determine her

pay rate, and maintain her employment records.

38.     At all relevant times, Ms. Lucas and Ms. Hinton were Urban One's employees as defined by the FLSA, 29 U.S.C. § 203(e), the EPA, 29 U.S.C. § 203(e), and Title VII, 42 U.S.C. §2000e(f).

39.     David Smith, also known as "Hurricane Dave," (hereafter, "Smith") was the former Vice President of Programming and Operations at Radio One Atlanta.

40.     Smith was employed by Urban One Atlanta from 2007 until August 2019.

## FACTS

### Unpaid Overtime Collective Action Allegations

41.     Plaintiffs bring this action on behalf of themselves and similarly situated current and former employees of Urban One who elect to opt-in to this action pursuant to the FLSA, 29 U.S.C. §§ 201 *et seq*., and specifically, the collective action provision of 29 U.S.C. § 216(b), to remedy violations of the wage and hour provisions of the FLSA by Urban One that have deprived Plaintiffs and others similarly situated of their lawfully earned overtime wages.

42.     In particular, Plaintiffs bring this suit on behalf of the following similarly situated persons: All current and former board operators, production

assistants, or individuals in similar positions that work or have worked for Urban One radio stations within the statutory period covered by this Complaint, have worked in excess of forty (40) hours per week and not been paid legally mandated overtime rates, and who elect to opt-in to this action pursuant to the FLSA, 29 U.S.C. § 216(b).

43.    In or around August 2012, Ms. Lucas was hired to work as a production assistant for Radio One Atlanta, a division of Urban One.

44.    In or around July 2012, Ms. Hinton was hired to work as a board operator and production assistant for Radio One Atlanta, a division of Urban One.

45.    As production assistants and board operators, the primary duties of Plaintiffs and those similarly situated involved assisting with the production of radio shows on Urban One radio stations.

46.    This production involved assigning commercials to on-air personalities, assisting guests on the radio shows, ensuring that commercials play and that shows come back on time, verifying that commercials and other media files were properly uploaded and organized on Radio One's internal systems, compiling audio files, and other tasks related to the timing of sound production associated with various Urban One radio shows.

47.    Thus, Plaintiffs and putative collective action class members are

similar because they were or are, employed by Urban One as board operators, production assistants, or in similar positions that primarily involve preparing the timing of the audio for radio broadcasts at Urban One radio stations, they were hourly employees, and they worked overtime but did not receive overtime compensation at a rate of one and one-half times their regular rate of pay within the statutory period.

48.    The primary job duties of Plaintiffs and those similarly situated do not involve the exercise of discretion and independent judgment.

49.    The primary job duties of Plaintiffs and those similarly situated do not involve administrative support for Urban One's general business operations.

50.    The primary job duties of Plaintiffs and those similarly situated do not include managerial responsibilities or the exercise of independent judgment.

51.    Plaintiffs and those similarly situated have no power to hire, fire, or discipline other employees.

52.    The daily work of Plaintiffs and those similarly situated is and has always been heavily controlled by their managers, including individuals like Myron Gigger, as well as by Dave Smith, the former Vice President of Operations at Radio One Atlanta.

53.    Plaintiffs and those similarly situated had and have no involvement in

scheduling, as schedules for Urban One were set by managers.

54.    The primary job duties of Plaintiffs and those similarly situated do not require any special license, certification, or education.

55.    The primary job duties of Plaintiffs and those similarly situated do not require creative invention or imagination or allow for wide creative license.

56.    While Plaintiffs have both appeared "on-air" on Radio One Atlanta stations, managers and Smith had ultimate authority and control regarding the radio stations' programming and content.  Any "on-air" activity was not a primary duty of Plaintiffs' employment.

57.    At all times relevant to this Complaint, Plaintiffs and those similarly situated have been classified as non-exempt hourly, rather than a salaried, employees.

58.    Ms. Lucas was hired in August 2012 at a rate of approximately $12.82 per hour and, after more than seven years of employment, continues to make approximately $12.82 per hour.

59.    Ms. Hinton worked as an unpaid intern with Radio One Atlanta from in or around 2005 to in or around 2012.

60.    Ms. Hinton was hired to be a paid employee of Urban One in July 2012 and was terminated by Urban One in May 2018.

61.     During her time as an employee at Radio One Atlanta, Ms. Hinton was paid between approximately $10.00 and $12.32 per hour.

62.     In the three years prior to the filing of this action, Plaintiffs and those similarly situated regularly worked more than forty (40) hours per workweek.

63.     In their history of employment with Urban One, Plaintiffs and those similarly situated have never been paid at the overtime rate of one and one-half times their regular rates for hours worked above forty (40) in a given workweek.

64.     Ms. Lucas' pay stubs reflect that the hours she worked in excess of forty (40) hours per week were classified as "Regular" hours, such that Plaintiff Lucas was listed as having worked 100 "Regular" hours in a two-week pay period and received her normal $12.82 for each of the 100 hours worked.

65.     Plaintiff Hinton's  pay stubs reflect that the hours she worked in excess of forty (40) hours per week were classified as "Regular" hours, such that Plaintiff Hinton was listed as having worked 110 "Regular" hours in a two-week pay period and received her normal rate, at the time, of $11.50 for each of the 110 hours worked.

66.     The pay stubs for Ms. Lucas also list some hours as "Overtime" hours; however, Ms. Lucas was paid "half-time" for these hours, such that Ms. Lucas was paid approximately $6.40 per hour for these "Overtime" hours.

67.     The pay stubs for Ms. Hinton also list some hours as "Overtime" hours; however, Ms. Hinton was paid "half-time" for these hours, such that Ms. Hinton was paid approximately $6.16 per hour for these "Overtime" hours.

68.     Upon information and belief, Plaintiffs and those similarly situated worked in excess of forty (40) hours per week but Urban One had a policy of classifying their overtime hours as "Regular" hours and of paying them "straight time" rather than the legally mandated overtime rate of one and one-half times their regular rates or classifying hours as "Overtime" but paying them "half-time" for those hours.

69.     For all hours worked above forty (40) hours in a workweek, Plaintiffs and those similarly situated are entitled to overtime wages of one-and-one-half times their "regular rate of pay," defined as their total pay for the workweek divided by the number of hours worked. 29 C.F.R. § 778.118.

70.     Upon information and belief, as part of its regular business practice, Urban One intentionally, willfully, and repeatedly engaged in a policy, pattern, and/or practice of violating the FLSA's overtime provision.

71.     At all relevant times, Urban One knew or should have known that its wage and hour practices were illegal, and that the FLSA required it to pay its employees an overtime premium for hours worked in excess of forty (40) hours per

workweek, yet it continued and continues to violate the FLSA.

72.     The net effect of Urban One's unlawful policy and practice is that Defendant enjoyed ill-gained profits at the expense of Plaintiffs and those similarly situated.

## Individual Disparate Pay Allegations

### Desiree Lucas

73.     In or around August 2012, Ms. Lucas was hired at a rate of approximately $12.82 per hour.

74.     Upon her hire in 2012, Ms. Lucas was told by her supervisor, Smith, that she would receive a raise within ninety (90) days.

75.     In her seven years at Urban One, Ms. Lucas has never received a raise.

76.     In or around February of 2018, Ms. Lucas complained to Tim Davies, the Regional Vice President of Urban One, that she was not receiving adequate pay.

77.     Mr. Davies then told Ms. Lucas that if she was unhappy with her $12 an hour pay rate, she should "go somewhere else."

78.     Upon information and belief, other similarly situated male employees, including but not limited to Dante Stewart, make more than $12.82 an hour for the

same work as Ms. Lucas.

79.     Upon information and belief, similarly situated male employees have asked Tim Davies for a raise, or for better pay, and have received more favorable responses than Ms. Lucas.

80.     Upon information and belief, Urban One discriminated against Ms. Lucas based on her sex by paying similarly situated male employees greater wages and compensation.

81.     Unlike similarly situated male employees, Ms. Lucas received the same hourly pay of $12.82 for the past seven years and was never given a pay increase.

82.     Conversely, upon information and belief, similarly situated male employees have been provided pay increases in their tenure at Urban One.

<u>Dominique Hinton</u>

83.     In or around September 2005, Ms. Hinton began working as an unpaid intern at Radio One Atlanta.

84.     In or around July 2012, Ms. Hinton was hired as a paid employee at a rate of approximately $10.00 per hour.

85.     In her six years at Radio One Atlanta, Ms. Hinton's hourly pay, including when she was working as a board operator for the Ricky Smiley Morning

Show, ranged from approximately $10.00 an hour to only $12.32 an hour.

86.     Upon information and belief, other similarly situated male employees, including but not limited to John Marshall, made more than $12.32 an hour for the same work that Ms. Hinton engaged in.

87.     Upon information and belief, Urban One discriminated against Ms. Hinton based on her sex by paying similarly situated male employees greater wages and compensation.

88.     Upon information and belief, unlike similarly situated male employees, Ms. Hinton was given a pay increase of less than $2.50 in approximately six years of employment with Defendant.

89.     Conversely, upon information and belief, similarly situated male employees have been provided larger pay increases in their tenure at Urban One.

**Individual Title VII Allegations**

Dominique Hinton

90.     Ms. Hinton worked as an unpaid intern for Radio One Atlanta from approximately 2005 to 2012.

91.     In or around July 2012, Ms. Hinton was hired to be a board operator for Radio One Atlanta.

92.     Soon after she began working as a board operator, Ms. Hinton was

subject to sexual harassment by Smith, who was the Vice President of
Programming and Operations at Radio One Atlanta, and one of Ms. Hinton's
supervisors.

93.     Smith had the power to hire, fire, and discipline Ms. Hinton.

94.     Smith regularly told Ms. Hinton that her body and her lips "looked
really good," and that she looked like she would be a good kisser.

95.     On one occasion, Smith called Ms. Hinton into his office, and told her
to turn around.  When Ms. Hinton asked if she had something on her clothes, he
told her, "No, I just wanted to get a good look at that," referencing her backside.

96.     During weekly air checks with Ms. Hinton, Smith told her, "I think
about you.  Do you think about me?"  Smith also asked her, "What's your favorite
sex position?"

97.     At these air checks, Smith also asked Ms. Hinton, "Do you like giving
or getting head?" and also told Ms. Hinton, "I think about you when I'm having
sex with my wife."

98.     Unsure of how to deal with these comments, and unaware of any
sexual harassment policy at Urban One, Ms. Hinton told her direct supervisor,
Mitch Henry, about Smith's comments and harassment.

99.     Upon information and belief, Mitch Henry did not further report Ms.

Hinton's complaints.

100.   Upon information and belief, Mitch Henry and other managers at Radio One Atlanta had never received sexual harassment training from Urban One.

101.   On another occasion in November 2014, Smith, while in an elevator at Radio One Atlanta, pushed Ms. Hinton against the wall of the elevator and forcibly kissed her.  Ms. Hinton blocked Smith with her arms.

102.   When the elevator arrived in the garage at Radio One Atlanta, Smith told Ms. Hinton, "If you scratch my back, I'll scratch yours."  Ms. Hinton understood Smith to be propositioning her for sex in exchange for career advancement and opportunities.  In response, Ms. Hinton played dumb, as if she did not understand his implications, thus rejecting his advances.

103.   In response to this rejection, Smith began gradually reducing Ms. Hinton's hours, giving her less work and therefore less income.

104.   Smith continued to make sexually harassing comments in the workplace, and eventually asked Ms. Hinton if she was a lesbian.

105.   Ms. Hinton continued to reject Smith's advances.

106.   In or around 2016, Smith also learned that Ms. Hinton had a boyfriend and was not a lesbian.  After learning this information, Smith grew more upset about Ms. Hinton's rejections.

107.   In response to Ms. Hinton's continued rejections and the knowledge that she was heterosexual, Smith began cutting her hours even more.

108.   In addition, Smith passed Ms. Hinton over for "on-air" opportunities.

109.   Another male employee at Urban One told Ms. Hinton that she wasn't getting opportunities at Radio One Atlanta because "she wasn't fucking."

110.   In April 2018, Ms. Hinton disclosed Smith's sexual harassment to a member of Urban One's HR department named Gloria.

111.   This HR representative (Gloria) told Ms. Hinton that her reporting would be confidential.

112.   Upon information and belief, Urban One conducted a sham investigation into allegations of sexual harassment by Smith in the Spring of 2018.

113.   After this "investigation" was apparently completed, Ms. Hinton was told that Smith was being "suspended."

114.   Upon information and belief, Smith's "suspension" involved being sent on a Tom Joyner "Fantastic Voyage" luxury cruise, paid for by Urban One.

115.   Smith returned to work in or around May 2018.  Upon his return, Smith indicated to Ms. Hinton that he was aware she had complained about him.

116.   Then, at the end of May 2018, a month after she complained to HR, Ms. Hinton was fired by Smith and Urban One.

117.   Ms. Hinton was told that she had uploaded the incorrect file for a commercial for the Ricky Smiley Morning Show, causing the broadcast of commercials with incorrect information.

118.   However, Ms. Hinton did not upload the incorrect file. Records show that files were altered while Ms. Hinton was out of the office on vacation.

119.   Upon information and belief, person(s) working for Urban One tampered with recordings in order to place blame on Ms. Hinton for the broadcast of incorrect information.

120.   In addition, other similarly situated individuals had uploaded incorrect files in the past and were not fired for such errors.

121.   Smith and Urban One used these recording inaccuracies as a justification for placing Ms. Hinton on final warning and ultimately for firing her.

122.   Smith placed Ms. Hinton on final warning in retaliation for her denying his sexual advances and for reporting him for sexual harassment.

123.   Smith and Urban One terminated Ms. Hinton in retaliation for her denying Smith's sexual advances and for her reporting Smith's sexual harassment.

124.   Upon information and belief, Tim Davies, Regional Vice President of Urban One, was aware of allegations that Smith was having sexual relationships with his subordinates in or around January 2016 and did not investigate this

allegations nor report them to HR.

125.   Instead, Davies pressured Ms. Hinton to remain silent about any allegations that Smith might be engaging in inappropriate sexual behavior with individuals he supervised.

<u>Desiree Lucas</u>

126.   Ms. Lucas began working for Radio One Atlanta in 2012 as a board operator.

127.   Immediately after she began working, Smith, who was her supervisor, took Ms. Lucas to lunch to "discuss career goals."

128.   At this lunch, Smith told Ms. Lucas that he could help her career but that she would have to do something for him.  Smith told her, "If you scratch my back, I'll scratch yours."

129.   Smith made it clear that he was propositioning Ms. Lucas for sex. Ms. Lucas told Smith she would not sleep with him and asked him, "Aren't you married?"  Smith responded, "Everyone cheats."

130.   Upon leaving the lunch, Smith told Ms. Lucas, "This is your last chance."

131.   Unaware of any sexual harassment policy, and never having received any sexual harassment training, Ms. Lucas reported this lunch incident to her direct

manager at the time, Otis Tillman.

132.   Mr. Tillman did not further report Smith's harassment.

133.   Upon information and belief, Tillman and other managers at Radio One Atlanta had never received training regarding how to handle complaints of sexual harassment in the workplace.

134.   Smith's harassment of Ms. Lucas continued after this first lunch.

135.   At their weekly air-checks, Smith frequently told Ms. Lucas that she looked sexy, while looking her up and down.  Smith would also frequently comment on Ms. Lucas' clothes and how good she looked in them.

136.   In June 2016, when Ms. Lucas was sick, Smith told Ms. Lucas, "Maybe if you didn't wear all those skimpy clothes, you wouldn't get sick."

137.   Ms. Lucas reported this comment to her manager at the time, Myron Gigger.  Gigger did not further report Ms. Lucas' complaint.

138.   At the same time, Ms. Lucas also reported this comment to another manager, Monique Hudson.

139.   In response, Ms. Hudson contacted an Urban One HR representative and told the representative that there was "something going on" in the Atlanta office that they should investigate and that women in Atlanta didn't feel comfortable speaking up about what was happening to them.

140.   Upon information and belief, in response to Ms. Hudson's call, Urban One sent an HR representative to the Atlanta office in 2016.

141.   However, the HR representative sat alone in a glass-walled conference room, visible to all passerby in the office, and did not interview any individuals in connection with Ms. Hudson's reporting, and Urban One did not offer employees an opportunity to speak to HR privately.

142.   As the conference room had glass walls, anyone who would have spoken to HR about sexual harassment would have been scrutinized by managers, including Smith, and could have faced retaliation.

143.   Upon information and belief, Urban One did no further investigation into sexual harassment at Radio One Atlanta in response to Ms. Hudson's 2016 tip.

144.   Two years later, in April 2018, a member of HR (Gloria) contacted Ms. Lucas regarding allegations of sexual harassment at Urban One.  Ms. Lucas disclosed the sexual harassment by Smith.

145.   Ms. Lucas also told Gloria that Smith had harassed interns and relayed a story of a specific intern who had been harassed.

146.   Ms. Lucas told Gloria that, upon looking at an intern's social media account, Smith asked the intern about a tattoo on her chest and asked if she liked pain during sex.

147.    Gloria told Ms. Lucas that her reporting would be confidential.

148.    Smith was one of the most powerful individuals in the Radio One Atlanta office.  He had the power to hire and fire most employees, and had the power to set work schedules, as well as to offer "on-air" opportunities.

149.     After Urban One's "investigation," Ms. Lucas was also told that Smith was being "suspended."  However, upon information and belief, Smith served his "suspension" by being sent on a Tom Joyner "Fantastic Voyage" luxury cruise, paid for by Urban One.

150.    When he returned, Smith began retaliating against Ms. Lucas.

151.    Smith fabricated a story about Ms. Lucas cursing in the break room and pressed Ms. Lucas' direct manager to put her on a final warning.

152.    Smith and Urban One also denied Ms. Lucas a promotion to an "on-air" position with the "Classic" station, to which she applied and was qualified for.

153.    Despite Ms. Lucas' Facebook Live show attracting a wide audience, Smith and Urban One cancelled the show.

## COUNT I

### UNPAID OVERTIME WAGES IN VIOLATION OF THE FLSA, 29 U.S.C. § 207

154.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs of this Complaint.

155.   Urban One is an employer within the meaning of the FLSA, 29 U.S.C. § 203(d).

156.   Plaintiffs and those similarly situated are employees within the meaning of the FLSA, 29 U.S.C. § 203(e).

157.   Plaintiffs and those similarly situated, during all relevant times, engaged in commerce or in the production of goods for commerce, or were employed in an enterprise engaged in commerce or the production of goods for commerce.

158.   The overtime wage provisions set forth in the FLSA apply to Urban One, Plaintiffs, and those similarly situated.

159.   29 U.S.C. § 213 exempts certain categories of employees from minimum wage and overtime obligations.  None of these exemptions apply to Plaintiffs and those similarly situated.

160.   During the statutory period, Plaintiffs and those similarly situated individuals were employed by Defendant as production assistants, board operators, and similar positions that primarily involved preparing radio broadcasts and commercials for Urban One's radio stations.

161.   The FLSA requires employers to pay for all hours worked.  The FLSA, 29 U.S.C. § 207 requires employers to pay employees one and one-half

times the regular rate of pay for all hours worked over forty (40) hours per workweek.

162.   Urban One's actions, policies, and/or practices described above violated the FLSA's overtime requirements by regularly and repeatedly failing to compensate Plaintiffs and the similarly situated individuals for overtime work described in the Complaint.

163.   At all times material to this Complaint, Urban One had knowledge that Plaintiffs and those similarly situated were performing work in excess of forty (40) hours per workweek for the benefit of Urban One without overtime compensation, as evidenced by the calculation of pay reflected in Plaintiffs' pay stubs.

164.   Urban One knowingly and willfully failed to pay Plaintiffs and those similarly situated overtime wages as required by the law for each and every hour above forty (40) hours per workweek Plaintiffs and those similarly situated worked for Defendant.

165.   Defendant did not have a good faith basis for its failure to pay overtime wages as required by law for all hours worked in excess of forty (40) hours per workweek by Plaintiffs and those similarly situated.

166.   As a result of Defendant's intentional, willful, and unlawful violations

of the FLSA, Plaintiffs and those similarly situated are entitled to their unpaid overtime wages in an amount to be determined at trial, an equal amount as liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, and costs of litigation, pursuant to 29 U.S.C. § 216(b).

## COUNT II

## VIOLATION OF THE EQUAL PAY ACT AS TO MS. LUCAS

167.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs of this Complaint.

168.   Ms. Lucas is an employee of Urban One, as defined by the EPA, 29 U.S.C. § 203(e)(1).

169.   Urban One is an "employer" of Ms. Lucas, as defined by 29 U.S.C. § 203(d).

170.   Ms. Lucas is female, and Urban One, in paying Ms. Lucas less than similarly situated males, has discriminated against Ms. Lucas in violation of the EPA.

171.   Upon information and belief, in refusing to give Ms. Lucas a raise throughout her seven years with the company, while giving raises to comparable male employees, Urban One discriminated against Ms. Lucas in violation of the EPA.

172.   Ms. Lucas performed the same job as similarly situated male employees that required the same skill, effort, and responsibility.

173.   However, Urban One refused to pay Ms. Lucas the same wages and compensation as similarly situated male employees due to Ms. Lucas' sex in violation of the EPA.

174.   Ms. Lucas has been consistently compensated at a lesser hourly rate than her male comparators, even though Ms. Lucas has performed substantially equal or greater work under similar working conditions.

175.   Ms. Lucas has also received fewer pay raises, and promises of pay raises, as compared to similarly situated male employees.

176.   Urban One's refusal to compensate Ms. Lucas in an amount equal to that earned by her male comparators was intentional, willful, and done in reckless disregard of Ms. Lucas' rights as protected by the EPA.

177.   As a direct and proximate result of Urban One's unlawful conduct, Ms. Lucas has suffered damages.

178.   As a result of Urban One's intentional, willful, and unlawful violations of the EPA, Ms. Lucas is entitled to all appropriate damages, remedies, and relief available under the Equal Pay Act for wage violations, including compensation in the amount of the difference between the wages, benefits, and

other remuneration that she earned and that which were earned by her male comparators; and additional equal amount as liquidated damages; and reasonable attorney's fees, court costs, and expenses.

## COUNT III

### VIOLATION OF THE EQUAL PAY ACT AS TO MS. HINTON

179.   Plaintiffs incorporate by reference all preceding paragraphs of this Complaint.

180.   Ms. Hinton was an employee of Urban One, as defined the EPA, 29 U.S.C. § 203(e)(1).

181.   Urban One was an "employer" of Ms. Hinton, as defined by 29 U.S.C. § 203(d).

182.   Ms. Hinton is female, and Urban One, in paying Ms. Hinton less than similarly situated males, has discriminated against Ms. Hinton in violation of the EPA.

183.   Upon information and belief, in refusing to give Ms. Hinton a meaningful raise throughout her six years as a paid employee with the company (and over twelve years in total with the company), while giving raises to comparable male employees, Urban One discriminated against Ms. Hinton in violation of the EPA.

184.   Ms. Hinton performed the same job as similarly situated male employees that required the same skill, effort, and responsibility.

185.   However, Urban One refused to pay Ms. Hinton the same wages and compensation as similarly situated male employees due to Ms. Hinton's sex in violation of the EPA.

186.   Ms. Hinton was consistently compensated at a lesser hourly rate than her male comparators, even though Ms. Hinton performed substantially equal work under similar working conditions.

187.   Ms. Hinton also received fewer pay raises, and promises of pay raises, as compared to similarly situated male employees.

188.   Urban One's refusal to compensate Ms. Hinton in an amount equal to that earned by her male comparators was intentional, willful, and done in reckless disregard of Ms. Hinton's rights as protected by the EPA.

189.   As a direct and proximate result of Urban One's unlawful conduct, Ms. Hinton has suffered damages.

190.   As a result of Urban One's intentional, willful, and unlawful violations of the EPA, Ms. Hinton is entitled to all appropriate damages, remedies, and relief available under the Equal Pay Act for wage violations, including compensation in the amount of the difference between the wages, benefits, and

other remuneration that she earned and that which were earned by her male

comparators; and additional equal amount as liquidated damages; and reasonable

attorney's fees, court costs, and expenses.

## COUNT IV

## RETALIATION IN VIOLATION OF TITLE VII, AS TO MS. HINTON

191.    Plaintiffs incorporate every preceding and subsequent paragraph of

this Complaint.

192.    During all relevant times, Urban One was Ms. Hinton's employer

within the meaning of 42 U.S.C. § 2000e(b).

193.    Ms. Hinton was an employee who in engaged in protected speech

under Title VII by objecting to and complaining against sexual harassment

prohibited by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e *et seq.*

194.    Ms. Hinton reasonably believed that she and others were being subject

to unlawful sexual harassment by Smith.

195.    Ms. Hinton objected to Smith's sexual harassment directly to Smith.

196.    After objecting to Smith, and denying his advances, Smith cut Ms.

Hinton's hours so that she received less compensation.

197.    Smith, acting for Urban One, cut Ms. Hinton's hours because she

denied his sexual advances.

198.   Ms. Hinton complained of Smith's sexual harassment to her direct

manager, Mitch Henry.

199.   Ms. Hinton complained of Smith's sexual harassment to Gloria in HR.

200.   One month after Ms. Hinton complained of Smith's sexual harassment

to Gloria in HR, Ms. Hinton was terminated by Smith and Urban One.

201.   The above-pled retaliatory conduct towards Ms. Hinton constitutes

unlawful retaliation against her in violation of Title VII.

202.   As a direct and proximate result of Urban One's unlawful actions, Ms.

Hinton has suffered lost compensation, healthcare, and other benefits of

employment.  Ms. Hinton has also suffered severe emotional distress,

inconvenience, loss of income, humiliation, and other indignities.

203.   Urban One and Smith undertook their conduct intentionally and

maliciously with respect to Ms. Hinton and her federally protected rights, entitling

her to recover punitive damages against them.

## COUNT V

## RETALIATION IN VIOLATION OF TITLE VII, AS TO MS. LUCAS

204.   Plaintiffs incorporate every preceding and subsequent paragraph of

this Complaint.

205.    During all relevant times, Urban One was Ms. Lucas' employer within the meaning of 42 U.S.C. § 2000e *et seq*.

206.    Ms. Lucas is an employee who in engaged in protected speech under Title VII by objecting to and complaining against sexual harassment prohibited by Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq*.

207.    Ms. Lucas reasonably believed that she and other women at Radio One Atlanta were being subject to unlawful sexual harassment by Smith.

208.    Ms. Lucas objected to Smith's sexual harassment directly to Smith.

209.    Ms. Lucas complained of Smith's sexual harassment to three different managers at various times:  to Otis Tillman in 2012 and to Myron Gigger and Monique Hudson in 2016.

210.    In 2018, Ms. Lucas applied for an "on-air" position with the Classic station.

211.    Smith denied Ms. Lucas the Classic position in retaliation for her rejection and opposition of his sexual advances and because Ms. Lucas had reported him to other managers.

212.    Ms. Lucas complained of Smith's sexual harassment to Gloria in HR in April 2018.

213.    A month after Ms. Lucas complained to Gloria in HR, Smith

fabricated a story about Ms. Lucas cursing in the break room in efforts to persuade Ms. Lucas' manager to put her on a "final warning."

214.   Ms. Lucas maintains that she did not curse in the break room and also that others, such as Smith, cursed regularly in the workplace.

215.   In August 2018, Smith cancelled Ms. Lucas' Facebook Live show in retaliation for her complaints about his sexual harassment.

216.   The above-pled retaliatory conduct towards Ms. Lucas constitutes unlawful retaliation against her in violation of Title VII.

217.   As a direct and proximate result of Urban One's unlawful actions, Ms. Lucas has suffered lesser compensation.  Ms. Lucas has also suffered emotional distress, inconvenience, loss of income, humiliation, and other indignities.

218.   Urban One and Smith undertook their conduct intentionally and maliciously with respect to Ms. Lucas and her federally protected rights, entitling her to recover punitive damages against them.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually, and on behalf of all other similarly situated persons, seek an order or orders providing the following relief:

(a)   Conditional certification of this collective action, and prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to all similarly situated board

operators, production assistants, and other similarly situated

individuals who worked at Urban One radio stations, nationwide.

Such notice should inform them that this civil action has been filed, of

the nature of the action, and of their right to join this lawsuit if they

worked in excess of forty hours per week and were not paid overtime

compensation, and tolling of the statute of limitations;

(b)   A declaratory judgment that the practices complained of herein are

unlawful under the FLSA, the EPA, and Title VII;

(c)   An injunction prohibiting Defendant from engaging in unlawful

employment practices in violation of the FLSA, the EPA, and Title

VII;

(d)   An award of unpaid wages for all overtime hours Plaintiffs and those

similarly situated worked under the FLSA at the overtime rate one-

and-one-half times Plaintiffs' and those similarly situated "regular rate

of pay," defined as their total pay for each workweek divided by the

number of hours worked pursuant to 29 C.F.R. § 778.118;

(e)   An award of back pay for both Plaintiffs, including all lost wages and

benefits of employment, pay increases Plaintiffs would have received

absent unlawful retaliation, including interest, in an amount to be

determined at the trial of this case;

(f)     An award of liquidated damages as a result of Defendant's willful failure to pay for all overtime hours worked pursuant to 29 U.S.C. § 216(b);

(g)     An award of liquidated damages for Defendant's willful violation of the Equal Pay Act;

(h)     Leave to add additional plaintiffs or opt-ins by motion, the filing of written consent forms, or any other method approved by the Court;

(i)     An award of prejudgment and post-judgment interest;

(j)     Compensatory damages, in an amount to be determined by the enlightened conscience of the jury, for Plaintiffs' emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life and special damages;

(k)     Punitive damages in an amount to be determined by the enlightened conscience of the jury to be sufficient to punish Defendant for its conduct towards Plaintiffs and deter it from similar conduct in the future;

(l)     An award of costs and expenses of this action along with reasonable attorneys' and expert fees, and other costs of litigation; and

(m)   Such other and further relief the Court may deem appropriate.

## **JURY TRIAL DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff

demands trial by jury on all issues so triable.

Respectfully submitted this 20th day of November, 2019.


**BUCKLEY BEAL, LLP**

By:   s/ Edward D. Buckley
Edward D. Buckley
Georgia Bar No. 092750
edbuckley@buckleybeal.com


600 Peachtree Street NE
Suite 3900
Atlanta, GA  30308
Telephone: (404) 781-1100
Facsimile:  (404) 781-1101

Attorney for Plaintiff